Final case for argument this morning is 25-1228 Janssen Pharmaceuticals v. Teva. We're ready whenever you are, Mr. McQueen. Thank you, Judge Prost. May it please the Court, John O'Quinn on behalf of the appellants. This case returns to this Court following a decision that provided extensive guidance and direction, but on remand the District Court repeated many of its prior legal errors and committed new ones to avoid the conclusion of obviousness. Could I ask you a housekeeping question first? Yes, sure. Which is, if any of the claims at issue, and I think there are five of them, six of them, is upheld as non-obvious, are you barred from entering the market until the expiration of the 906 patent? I believe that's correct, Judge Prost. I think actually all the claims are at issue. It's just five of the claims are representative. Claims 2, 10, 13, 20, and 21 are representative. But respectfully, I submit that all of the claims here are obvious. Has this Court previously observed the safety of Palo Verde? I'm sorry, can I just, so just hypothetically, suppose we thought that the opening claim,  Claim 2 was valid. Do we need to get to the other, to the renal insufficiency patients or the particle size one? Because they wouldn't make any difference to your getting a FDA approval, or do we not need to get to them, or what? So, Judge Taranto, I think that if you look at the way that the renal impairment claims are written, many of the same arguments apply to them as they do claims 1 and 2. And so I don't think that there would be a separate basis to get to them. And in addition... And vice versa? I mean, again, I think if any of the claims survive, then you couldn't get approval for an HANDA. And that's the only thing that's at stake? And that's what's at stake here. Even Claim 13, right? Even Claim, well, yes, because I think the label requires that you have that range. And there's no possibility of modifying labels or whatever in the interim, that sort of thing? I'm not aware of any, for purposes of getting an HANDA, with respect to, given that the label requires that you have a range that recovers all of these. But, Judge Post, I actually, on whether or not Claim 13 versus Claim 10, and whether the label could be adapted as to that, I'm actually not sure. There is perhaps a possibility there that that could be done, so I don't want to speak categorically. But I think as a general matter, we've stipulated infringement as to all of them. The question would then be, is there a way to adjust the label based on those differences? Can we start with Claim 2? Yes. It's not your typical range case, in at least one major respect, which is you've got range, arguably, laterally, but not horizontally. And so I'm looking for a case or something that extends our analysis and presumption analysis that applies, at least in certain circumstances, to this case.  So, Judge Post, I mean, to take a step back, I mean, what you have here in terms of the range is something that differs from the prior by a single dose on a single day. And everything else related to that is obvious. There's other differences, right, other than just the dose. So the other difference, Judge Rayner, the only difference other than a numerical difference, is the injection into the deltoid as opposed to the gluteal. The 548 protocol was certainly directed to the gluteal, but the other... The side of injection is one difference, and I think that's a major difference. But let's start with the notion here that Claim 2 is a methods claim. Sure. And, you know, to take a step back... It's not a composition claim, and it's not a claim that goes to a specific dosage. It's a method, a steps, a schedule. Right. And, Judge Rayner, if you look, for example, at, you know, and coming back, I think this is responsive to your question, Judge Post, as well. If you look at this Court's decision in Peterson, I think Peterson rejected exactly the same kind of argument that there's, like, something about being, you know, quote, unequal and decreasing that then takes you out of the overlapping ranges case law. And in that case... I'd like to kind of complete Judge Post's question. We do not have a classic range case where there's an earlier piece of prior art that says you may use from N to M. And the new patent comes along, and you have something that actually falls within that range. We don't have that. Well, respectfully, Judge Toronto, I mean, this Court's range case is recognized that you can take a range from various data points that are disclosed in the prior art. This Court recognized that page 926 of its prior opinion that the, quote, was at least 50 to 150 milligram equivalents. That's disclosed by the 540 protocol, which was doing 150, 150, 150, 100, 100, 100, and 50, 50, 50. It's also disclosed...  That protocol did not say, let's do everything between 50 and 150. No, but... It did not say that.     But there were three separate ones, right? There were three separate ones. This is not insignificant, because range law involves... And, you know, the question I think Judge Post was asking is, do all the cases fit into this, or are there some that go beyond that? The ordinary range case, maybe all of them, is where what's now claimed is actually claimed inside the prior art. And it's sort of surprising, if you don't know anything else, that you wouldn't just stop there and say, anticipate it. Or maybe there's some other things, but that at least within the range. We don't have that. And hence you have all of this law about, we're going to still give you a chance to show that it's nevertheless not obvious, are they unexpected results or... Criticality. Criticality or something like that. But I'm not sure we even get into the door of the range cases here. Well, coming back to my reference to Peterson. In Peterson, what you had is different components, different compositions that were all within different ranges. And Alamorell itself recognized that the different ranges that different components can come from can be in different pieces of prior art. And in Peterson, the Court was faced with the argument that, well, yes, it's true that chromium was disclosed in a particular range in the prior art, and rhenium was disclosed in a range in the prior art. But what was not disclosed was that you needed rhenium to basically be in a certain relationship with chromium. This Court in Peterson nonetheless applied the overlapping ranges presumption and addressed the issue of the difference between the rhenium and the chromium and the purported relationship in the claim versus what was in the prior art. And that's Peterson you're talking about? That is Peterson. And I point you to pages 1328 to 1331 of the Peterson decision. I thought that that Peterson actually disclosed ranges. Peterson disclosed ranges for each component. The prior art in Peterson disclosed ranges for each component separately. And then you had the claim that said, ah, but I need a particular, a particular short range, I believe if I remember right, a short range of rhenium and then a particular point of chromium. And the argument was sort of like the argument here about unequal decreasing was to say, but no one would have known you needed this ratio between rhenium and chromium. And the Court said, no, the overlapping ranges presumption applied, and the argument you're making goes to criticality. Is there something about that that creates a synergy? Let me stay where we are. It seems to me there's a range here, an arguable range. And that range is if you take first loading dose and you say, okay, the range in the prior art is first is 150, then it's 100, and then there's 50. This comes between that. Second loading dose, is there a range there? So there are arguably two ranges, but that doesn't account for the unequal part of it. And there's no range there. Tell me where the range is that would cover the unequal portion. I mean, to take one step back, Judge Post, I mean, our basic proposition here is that any dosing regimen in the range where any of the doses on days 1, 8, 30, 60, et cetera, would be obvious if those doses are in the range of 150 or 50 to 150, that any of them would be obvious. And it would be obvious that, you know, for the particular needs of a patient, to use doses that fare within that range. I mean, it's telling. The original claims here were claims where both loading doses were in the range of 100 or 150. And then they went in and they picked 150 and 100, not because 150, 100 is special and works better than 150, 150. That's not true. No, no, no. I'm not sure we're just, I'm at least not disputing that it would necessarily satisfy the criticality. The question is how you get to that inquiry unless you have the presumption and the presumption needs a range. Now, let me ask you about another case, Enrage-Titanium, which you cite in gray, but I don't think you make a detail. But in that case, there were, they were dealing with two different prior art alloys and the difference, and so they had two variables. And Judge Rich, in that case, sort of did the two variables. That was the closest I could come to what we're talking about here. But I'm not sure. Well, I think Peter, I think Judge Larry's opinion in Peterson is exactly the same. I think the exact same argument was potentially at issue in Almerell as well, page 269 of that decision. Both of those involved not just two components, but actually multiple compositions where, you know, there were prior arranges. And again, in Almerell, the prior, you know, in Peterson, I think you could point to a single prior art that disclosed all of the various ranges that applied to the various compositions. In Almerell, they actually had to go to different pieces of prior art to point to the ranges that applied to the different compositions. Are those composition patterns? I don't recall off the top of my head, Judge Raynor, whether they involve, just involve compositions or they involve broader things as well. It doesn't. The presumption obviously supplies whether we have the pen as a method, your pen in a method that maybe ties in the quantity of the dosage, but on a specific, very specific schedule, which itself is tied into the injection site. Well, so a lot built into that. Let me try to unpack that. So first, the injection schedule is specifically disclosed by the 548 protocol. I mean, and so what you have Just the timing. What do you mean by the schedule? Well, the schedule, yes, the timing. That's what I mean. And so what you have, the claims cover doing 150, 100, 100, 100, 100. What that means is one difference on one day. That is the very first day of doing 150 instead of 100. The 548 would otherwise, the 548 would, it still would be an obviousness argument rather than anticipation because the injection in the 548 was to the gluteal. The 548-Furo, the W038-Furo disclose intramuscular injection generally. They also disclose their range as a range. The W038-Furo, for example, specifically teaches injections ranging from 25 milliliters to 150 milliliter and anything in between those except I think they're regimented in either 25 or 50 milliliter increments. The 548-Furo itself teaches from 65 to 230 milligrams. That's the converting based on body weight and teaches that it results from investigations into development of an efficient, well-tolerated, deeper formulation. So what you have is a difference that is known in the prior art. They're all expected to be safe and effective. Indeed, the district court said in appendix 29 that she would, that a scared artisan quote would credit Janssen's hypothesis that the doses tested are likely to be safe and effective. And you're just changing either the first dose from 100 to 150 compared to what's in the 548 protocol or you're changing the second dose from 150 to 100 compared to a different dosing regimen in the 548 protocol. And with respect to liberal versus deltoid, number one, the district court did find on remand, had not previously, but did find I think correctly that that is a, that that is an obvious distinction. It's another obviousness factor that must be considered in an obviousness analysis. Sure. Here we just don't, we're just not looking at obviousness through the lens of range. Well, I mean, there's other issues involved in this case as well. And the injunction side is one of them. I would point you to Judge Lori's opinion in Valiant. This Court specifically addressed the question of, quote, whether overlapping ranges may only establish a prima facie case of obviousness when the only difference between the prior art is the range or value of a particular variable. And the Court rejected the idea that the overlapping ranges presumption can only apply if there's only a single difference. In that case, there were multiple differences. More significant differences, deltoid and gluteal well established what the differences were in the prior textbook differences. As you can see in Appendix 14-134 and 14-183. In that case, it involved an entirely different compound. And the Court still applied the overlapping ranges framework. Now, I realize that we've spent most of my time and then some on overlapping ranges. We also explained why the district court was wrong on motivation, wrong on expectation of success, legally wrong as to those. Okay. Can we move on? We're really out of time. But we've got to spend more time than allotted. Can you move to moving to the renal impairment claims? Yes, Judge Gross. I think we're left with mild. But I think that's the case you put on. So if I — let me just follow up. Oh, absolutely. I'll give you a chance to respond. If I think the district court was wrong about the teaching away in Clayton, however you put this, on mild impairment, at least with respect to teaching away, and that you showed enough motivation for INVEGA ER to reduce the dosages by half, does it really matter that the district court viewed your theory as a mild renal impairment? I think you should embrace it. It does not, Judge Gross. I mean, the district court's wrong in warning himself, and you can see the appendix 10331, relied on the Clayton 2007 reference, which they were saying, you know, teaches away. So if he's relying on it, then that just shows if you — that it wasn't limited to mild. But regardless, the only significance of limiting it to mild would be then for their teaching away argument, which I think is wrong for the reasons that this Court previously found. And then with respect to Claim 13, I mean, they're treating the skilled Edison like an automaton to say, oh, we're only going to divide by half, as opposed to just recognizing that as a general proposition, you would reduce. And I think, again, you're within ranges that are disclosed by the prior error. Okay. Can I ask —  Can you address briefly secondary considerations or objective addition, rather? Sure. I'd be happy to. I think, you know, first of all, and perhaps most principally, you know, the fact that the majority of practitioners, physicians, do not use the claimed protocol — excuse me, the claimed method. You can see this is in Appendix 17903. The majority do not use the regimen. I think it is kind of fatal to their secondary considerations theory in and of itself. Beyond — you know, so you don't have the necessary nexus. Second, I think the District Court kind of repeated its prior mistake of kind of relying on the safe harbor alone. And then third, you know, even if you think there is some evidence of secondary considerations, you know, as this Court made clear in Alcon v. Apotex, then you, in making the ultimate de novo determination vis-à-vis obviousness, would weigh those against what I think are, you know, plainly obvious claims. And as the Supreme Court said in the Agpro case, you know, long-form need and commercial success without invention will not make patentability. So I think that their secondary considerations argument also depends, you know, on really relying on compound claims and composition claims. You're arguing no nexus, essentially, right? I'm arguing no nexus. I'm arguing a diminished value of any commercial success, you know, for the same reasons that this Court recognized in cases like Accordia v. Roxanne, that you do have a situation where the way that you put on it, you do have a situation where they're plainly blocking patents. They kept the field, you know, from being able to be entered for decades. Judge Tronto, I think you had a question. Oh, this is really trivial, and I'm sorry, but, you know, on page 77 of your brief where you have your blocking the fortress diagram. Yes. Two questions. Sentence above, you said, then added esters, including paliperidone, palmitate, and you cite the 556 patent. Yes. Is that esters? And then second, what is the 459 patent from October 1994 underneath that? I don't know off the top of my head. I mean, they are different patents. That's not a typo. They do go to other. They go to, I think the 556 claimed a broad category that included palmitate, and I think that's why they were pointing to it. And then, you know, the leaked, I'm sorry, the 459 patent I think went to particular technology that was used in the production of the patent.  One more kind of doctrinal. But I may be mistaken about that. One more kind of doctrinal question. When somebody makes out a prima facie case, then a burden of production is cast on the patent owner to put in certain evidence. Correct. We've said, I think, that once that evidence comes in, the burden of persuasion remains on the challenger. Does that scheme, which is a very standard scheme, apply even in the range cases, or are you suggesting that there's a shift in the burden of persuasion when you meet the preconditions for the range cases? No, Judge Toronto. I think it's the same regime, same scheme that you just described. Our position is that, number one, they don't make out the case for criticality here. Their evidence, and second, that their own evidence actually rebuts the case for criticality because what it shows you is that, you know, there is nothing special about 150-100. It's not like this is some synergy and 150-100 is like miraculously better than 150-150. It's not. In fact, the patent itself discloses that 150-150 and 150-25 did better than 150-100 in various clinical trials. This case really, when I hear that argument, really brings the thought, if that's the case, why didn't they think about this before? But, you know, I didn't do it at that. Just a couple minutes, a minute on the particle size claims. Let's assume hypothetically that we or I disagree that there was teaching away from formulation B in the FIFO book. I don't know how we get to a reversal in that case rather than a remand because I don't know whether you carried your burden or motivation to select formulation B in combination. Well, I think, Judge Peralta, we're actually in the world of a slightly different presumption because we're in the world – our argument is that we're – that we are in the world of a results-affected variable. And so I think this case would be controlled by cases like applied materials. And so you don't need a separate motivation. And, in fact, motivation is in many ways conceded. If you look at Appendix 23, the district court observed, quote, both sides' experts agreed that a skilled artisan seeking to achieve rapid therapeutic effects would be motivated to modify the particle size, end quote. Their expert essentially conceded the same thing at Appendix 11,777, that there can be no dispute that it's a results-affected variable. That's clearly disclosed in the 5404 patent. It teaches, quote, the pharmacokinetic properties depend on particle size. That's Appendix 13,239. And their own expert effectively concedes. But does the district court address the results-affected variable there? So the district court purports to punt on that, and that's at Appendix 47 footnote 34. But, again, I think the district court's recognition at Appendix 23 that both sides' experts agreed a skilled artisan would be motivated to modify the particle size and the fact that there is no evidence whatsoever, none on the other side, to show that it is anything but a results-affected variable means there is only one conclusion that can follow from the undisputed facts as a matter of law. And I don't think that a remand would be fruitful in this case. I think this court can decide all of this because, again, there is no evidence that it's not a results-affected variable. That's the reason that they rest so hard on an erroneous teaching-away argument. Oh, Judge Taranto. I think you said, and I may have misheard, that the 906 patent itself shows that if you have two loading doses, 150 and I think you said 25, that that's better than 150 and 100? Yes. Where's that? Yeah, I point you to a couple of places, Judge Taranto. First, it refers to optimized loading doses at column 23, lines 15 to 25. And then with respect to performance compared to 15 to 25. And so where does that? So that goes to the optimized loading doses point. And then with respect to your particular question, if you look at which ones achieved eight-day efficacy in clinical trials, it's column 28, lines 3 to 8. And it identifies 150, 150, 150, 25 as achieving eight-day efficacy. Again, this is column 28, lines 3 through 8. 150, 100 only, I think, achieved it at day 22 in these experiments. And for the idea that all of this is just a difference in degree, none of this is a difference in kind, I would just also point you to Appendix 31907, 54693. But both of those go just more generally to how whether you were using 75, 75, 100, 100, 150, 110, it's just a difference in degree, not a difference in kind. But as I said, the patent itself, I think, concedes that array, both in terms of identifying that all of these were optimized loading doses, that all of these were better than placebo. That's column 28, lines 3 through 7. And then the thing that I referred you to specifically at column 28, lines 3 through 8. Thank you. Thank you, Judge Poston. We'll restart the rebuttal. Thank you very much. Well, good morning, Your Honors. Are you ready? Yes. Okay. May it please the Court. Barbara Mullen for Jansen. So let's start from the premise that Teva had the burden of proving obviousness by clear and convincing evidence for every representative claim. Okay.  But you've sat here for all of this, so can we just dive into – I mean, I'm struggling with the question of whether a presumption applies, and that really affects what you're going to be talking about.  So if we had – if the claim loading dose was 149 to 149, first and second, would you say that the presumption of obviousness applies? I still don't think it applies, Your Honor. So first let's step back and say that from the perspective of the 548 protocol and what it discloses, I think it's important to remember, not only does it disclose all equal dose dosing regimens, but that Dr. Wormling admitted that that does not motivate any unequal dosing. But I guess here's – I'm surprised to hear you say that, because I thought the whole difference, what anybody thought, was the decrease in the claim. And if you have a situation where there's no decrease, I'm really having a hard time seeing why that wouldn't come within the range protocol. Would 149, 149 come within the range of 150, 150, or 100? The range that we already have in the prior art. 150 to 150, 100 to 100, 25 to 25. I suppose if you're just – if you're saying we're just going to look at the range and ignore that there's other differences, perhaps it does. But the difference here, obviously, is not that. We have a difference because not only is the difference in the specific sequence of dosing in Claim 2, which is 150, then 100, but also in the fact that that is so far removed than what's suggested by the 5-for-8 protocol that Dr. Wormling said. The 5-for-8 doesn't even suggest or motivate opposed to use any unequal doses. And that's at Appendix 10479. But I'm talking about a claim that has – doesn't have unequal doses, that has 149 and 149. So if there are no unequal doses in the claim, wouldn't a range apply? Potentially. Okay. So then if we have – let's say the claim was 149 first dose, 148 the second. Is that really a void? So the 150 to 100 would be – wouldn't 150 to 100 be presumptively obvious then? No. The answer is no, right? And that's because – just because it's one different, 149 going down to 148, that avoids the range? No, it really is because the presumption of obviousness cases apply, first of all, as you've already discussed, primarily in cases where it's only a range that's different. Now, I know that my friend was talking about certain cases such as Valiant, Amaral, titanium perhaps, where this court has extended that to say, okay, if it's not just an overlapping range, if there's another difference, for example here the deltoid difference, but in those cases they've said, if it's not just an overlapping range, if there's another difference, maybe, maybe we apply a prima facie case to this where the facts establish that the two things that you're applying to are interchangeable, right? So let's go back to Valiant. Valiant was talking about chemical compounds. It was two different chemical compounds. The prior art disclosed a pH range for one of them. And they said that creates a prima facie obviousness case for the pH range for the other one. Why? Because the factual evidence was that they were structurally and functionally similar so that it would be expected to apply. Same thing in Amaral, right? The two agents were found to be interchangeable, and that's why the range was applied to both. That's not the case we have here. One of the distinctions we have here is the deltoid. And the district court, what the district court found was that the deltoid, opposed to what it expected to be interchangeable.  So hypothetically, let's assume that we take deltoid off the table. Okay. That we don't think our cases necessarily preclude that. So then we're left with the ranges. So can we talk about the ranges? Your friends seem to rely heavily on NRA Peterson. Do you have an NRA titanium as a secondary thing? Do you have any view on Peterson? Well, I think that you're taking out a key part of obviousness, which is, you know, with respect to the claim as a whole. So if you're saying can we ignore everything in the claim except potentially numbers, I still don't think it's a range case. Because I think that the concept of an equal dose dosing regimen is much different than the concept of the claim to regimen. So I don't think that it's just a simple presumption can apply here, right? Because you have a difference not only between the start with 150 and then 100, but you have the very difference that conceptually, if you have a patient that can be maintained on 25 MIG equivalents or 50 MIG equivalents as a maintenance dose, okay, that's going to be their monthly dose. They still get 150 and then 100 to start with. That's not only a conceptual difference, it's an actual difference. Because what we know when you compare the 548 protocol to what actually happens is that when the 548 protocol is used, you don't get rapid efficacy, whereas with the claim dosing regimen, you do. Do you have – is there anything in the spec that calls out the criticality or the need of this? Because your friend did call out provisions in the spec, as he did in the spec, which suggests that there's – this isn't – I mean, the only optimal thing, language I could find in the spec was the fact that these three are all optimal. And, in fact, there's that other provision he cited to say that there was even – the other three were better. Sure. Well, actually, if you look at the appendix page 171 and 172, this is example 8, at the bottom of column 26 and continuing into example or column 27. What my friend is pointing to is not what's in the prior art, because the prior art doesn't involve deltoid injections at all. So what he's pointing to is not in the prior art. What he's pointing to here is a study where every single patient got 150 MIG equivalents in the deltoid on day one. So that whatever efficacy they saw by day eight, that was from the 150 MIG deltoid dose. What it goes on to say in column 27 is what happens after that when you change the dose at day eight, where some patients got 25, some got 100, and some got 150. And what happened was on that day eight, if you gave them 150, those levels continued to rise. If you gave them 25, they completely dropped. But, you know, if you just gave them that 100, not only did you reach the threshold, but you maintained that study. And that is what the patent is explaining to you, and that is the regimen that's claimed. All right. But none of this, does any of this call out that there was some criticality or more optimized than others for this 150, 100 that's claimed? I think that calls out that that's the combination that gives you not just rapid but sustained efficacy, which is what is achieved by the claim. It's not just the loading doses achieve the rapid efficacy, but then the maintenance doses maintain the sustained efficacy without, for example, the 150 dose taking you to an area of potentially very dangerous, very severe side effects with a 25-risking relapse. So I do think it shows that that is critical. I think the other thing to think about with the presumption cases is that in all these cases where presumption applied, routine optimization was a theme. You have cases saying that it is not inventive to discover optimum ranges by routine optimization. Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. That's the premise. That's why you're changing things a little bit. Because the premise of all the presumption cases are that routine optimization is involved. In this case, it's not very well suited to that because we don't have anything to optimize. The 548 protocol is a protocol without any data, so there's no data to optimize. And when I asked Dr. Wormley during trial, is routine optimization part of your theory, that was the only time that those words came up at trial, and he said no. Did you find any cases where the presumption applies and we're dealing with a method pattern? I don't recall one off the top of my head. I do recall many where you're talking about a composition of whether or not you get ranges from one reference or two references or three references. That may not make a difference, but I'm actually not aware of one standing there. What about Inmate Peterson? Inmate Peterson was about alloys, and I think it was actually just applying a range to the alloys. Did it involve different variables? It involved different references that provided the ranges. One reference that provided multiple, sorry, one reference that applied multiple ranges. And I know N-ray titanium was only cited in gray, but do you, that seemed to me, it's not a range case, but it was referred to in Peterson discussing ranges, and it feels like it was an obviousness case. And that involved two different variables, so you analyzed each separately and said, is this within the range for variable one? Is this within the range for variable two? That seems closer to our case than some of the others I've seen. Maybe, but you're still just applying ranges, right? And I guess we get back to the premise of does the 540 protocol disclose a range at all? Well, actually, it was a little different than ranges. I mean, it had numbers. Like the prior art had 30 and 50, and then this had 30. Right, but that was said to establish a range, right, effectively establish a range, right?  Yes, but again, it was a range, not the distinction between a regimen that had all equal doses versus a regimen where you have a maintenance regimen that is completely separate from the loading dose regimen and a loading dose regimen that is specific. You give 150 in deltoid on day one and 100 on day eight. And if you do that, and only if you do that, do you get most of the patients into the therapeutic window within one week and keep them there. I think in addition to the issue of whether or not the presumption applies, should even apply here, if it did, it would be rebutted. As Teva said in his reply brief at 7, the presumption is rebutted with evidence that the claim to values are critical or special or otherwise not from routine optimization. So what you're saying is if the 548 had 150 and 140, then that would establish a range that would be applicable to the claimed? I think it's a different concept. I see it conceptually different because you're talking about an equal dose regimen where you have a patient who needs 150 mg equivalents to be stable, so that's what you give them. Or they need only 50, so that's what you give them. No, but that's why I said the hypothetical is 150 to 140. So it's a variation in the first and the second loading doses. It would be a variation. It would not suggest a specific combination here. And I would not characterize it still as a range if it's on specific doses, right? Do you want to comment on the renal claims? We had a little discussion there. Yes. In terms of teaching away. Let's assume that we're talking about mild renal impairment. Yeah. I don't think that the district court was actually had a finding of teaching away for the renal impairment claims. That was only for claims 20 and 21. But Cleeton 2007, I guess the issue is that TEVA had to establish not just the general proposition that because these drugs are cleared renally, that you have to reduce them in a renally impaired patient, but how you get to the actual regimens of claims 10 and 13. And the prior art was kind of all over the place, right? Well, what about Invega ER? Invega ER says a 75% dose reduction for moderate or severe renal impairment. That's appendix page 16233, but it's not talking about mild renal impairment. Cleeton 2007 said no reduction for mild renal impairment, only consider it for moderate to severe. And if you apply that 75% reduction from Invega ER, and I think that's actually between the maximum allowable dose and the renal dose, but if you apply that 75% reduction, you don't get to claim 10 or 13. I'm sorry. I may be wrong on this. I understood it to be a 50% reduction. Well, that was a theory. The question is where did that come from, right? Well, the argument is it came from Invega ER, which represented a 50% reduction. Well, there's no Invega ER actually said that there's a 75% reduction. Can you grab that 16233? Okay. I mean, you know the record obviously better than I, so I may be right about that. Yeah. At appendix 16233, the Invega ER label says that there's a 75% dose reduction for moderate or severe renal impairment. But the bottom line is the prior didn't have anything consistent about how you would reduce the doses in order to address renal insufficiency in not to address renal insufficiency. And in addition to that, it's not just that you have to reduce them, but how much you have to reduce them, right? Um, so I don't know if you have another question on that if you'd like me to. Yeah, I'm just trying to look because I thought, but I don't want to quibble with you. As I said, it's your record. It's just I thought that the Invega ER went from 12 to 6, which was a 50% reduction. But maybe I'm mistaken about that. Anyway, just one quick question then.  On the particle size. Do you want to just any comment on the counting away formulation? Yes. So the question was, as this court instructed the district court to do to determine whether or not the D50 value in the 544 patent was criticized, discredited, or otherwise discouraged. The 544 patent says that a formulation having a D90 of less than 2,000 nanometers is necessary to be acceptable for intended patients. That is the characteristic of formulation C and D, which were the only formulations advanced to stability. Our expert, Dr. Sinkow, testified that when you read all of this together, that a POSA would have eliminated formulation B from further testing. And Applied Materials says that when a POSA would be led in directions divergent from the path that the inventors followed, that that constitutes teaching away. And while my friends talked about the idea that everybody knew that particle size impacts the pharmacokinetics, that's true. But it's not enough that the POSA knew we could do something here to change things. The question is, what would they have done? And if you actually look at the four examples in the 544 patent formulations A, B, C, and D, the record evidence shows that the 544 patent is about a formulation that's being given every three weeks to a month. So that's a long-acting formulation with no rapid efficacy. If you wanted to make it more rapidly effective, then all that's in the record is that you would make the particle sizes smaller. Well, C and D actually already had the smallest particle sizes, and they were the ones that were tested for stability. So the smaller the particle size, the higher the ratio of surface area to volume. The faster it is. So you get more exposure.  But, I mean, the thing is that it doesn't actually happen. What's the best sentence, if there is one, in 544 that says this D90 cap is essential to what we're up to here? Obviously, in different words. Yeah, it's appendix page 13238 at column 2, lines 60 to 64. 60 to? 60 to, column 2, lines 60 to 64, and appendix 13239 at columns 3, lines 11 to 45. And then you have at 13242 at column 9, lines 33 to 44, only formulations C and D were advanced to stability tests. And the other side made a point about how I think the D50 figure is, or what's in the claim here, is covered by claim 7 of the 544. I'm not sure I really understood the point. So claim 7 of the 544 patent, let's grab it so I don't misquote it, is a method for treating schizophrenia and other diseases. With the composition of claim 1. With the composition of claim 1, the composition of claim 1 is talking about, if you see the description of claim 1, and particularly with respect to the particle size, it is talking about a surface area greater than 4 meters squared per gram corresponding to an effective average particle size of less than 2,000 nanometers. And this patent defines effective average particle size as D90. Okay. One other small question about the objective indicia, in particular the industry praise. The label, this is at, what, 13118 to 120, seems to allow initial doses significantly larger than the claim, than the doses in the claim here. And if that's right, and people were praising the dosing regimen from the label, why would that indicate praise for the claim dosing regimen? The label dosing regimen is 150 on day 1 and 100 on day 8. So, okay, just show that to me. I'm just looking. I figured I was misreading this. I'm showing a box that says 234 and 156. Oh, I'm sorry, so that's the difference between milligrams and milligrams equivalent. I see. Okay, so the milligram equivalent is 150 milligrams. You're telling me those translate. Yes, I am. Don't make me do the math in my head. But, yes, that's the case. Thank you. Can I?  If I can just, I want to make just one or two more comments because I feel like I need to based on what's already been said here today. Okay? The 544 patent teaches administration of a single dose of paliperidone pomatate that's effective for three weeks to a month. It doesn't teach loading doses. W0384 does not disclose anything about a dosing regimen, much less give motivation to select the claim loading doses. They were admissions by Dr. Wormling at appendix pages 105, 06 to 7, and 105, 11 to 12. So the district court did not, was not erroneous in its findings that these do not teach loading doses to initiate treatment, discuss a multi-dose regimen, or address the complexities that present themselves when administering multiple doses of varying amounts at different times. The other comment I would make is about the blocking patent. If you look at the graph, it includes things that, by the way, aren't even Janssen. It's got Elon technology on there. But in addition to that, the question on blocking patents is a fact-specific inquiry. The question is, would competitors have been deterred from investing resources needed to make the invention at the priority date? And the district court here went through a several-page analysis in concluding that there was no deterrence in fact. And in fact, Tether itself filed an application, a patent application for paliperidone palmitate about the same time as the priority date. And since we know that drug development takes at least 10 years, we also now have on the market erzofra, which the first clinical trials were done in November of 2018. So erzofra had to be being developed at the same time. That is a drug that uses paliperidone palmitate in a different dosing regimen. It was approved by the 505B2 pathway in the Hatch-Waxman Act. So it's not that the world is precluded from using this drug for many years. They're just for the limited period of time that we have our patent. They're precluded from copying our very specific dosing regimen. Thank you. Thank you. We'll restore four minutes. Thank you, Judge Prost. Judge Toronto, on your questions about D-90 and D-50 and such, there's no inconsistency between having the claim D-90 in the 544 and the claim D-50 in the 906 patent. Their whole theory of teaching away comes from basically them looking at formulations A, B, and C and saying, well, you know, these two that fit the D-90 that they had experimented with wouldn't fit our D-50. But there's no inherent inconsistency between having a D-90 of 2000 and having a D-50 in the 900 to 1600 range. It's only that the D-90 has got to be 2000 or lower. It's just a different way of measuring things. But the formula B had a D-50 that was within the range, but the D-90 was through the roof. The D-90, well, I think it's actually the D- That's right. That's exactly right. Whereas C was D-C, excuse me, the formulation C was very close on both. And the idea that, like, you would, based on, you know, those relatively arbitrary formulations would say, ah, this now teaches away, it's just bootstrapping upon bootstrapping because there's nothing that specifically teaches away from the D-50 that is claimed. Now, turning to the renal impairment claims. Now, that is one where the labor is different from the claims. The labor actually teaches starting with 100 milligram equivalents as opposed to 75 milligram equivalents, which is what the focus of the patent is. Although, you know, I do agree with the fact that the things that you were asking about just go to a math, a mathematical conversion. But with respect to the renal impairment claims, the district court did, in fact, rely on teaching away. That was Appendix 41. And Judge Post, you're absolutely right. Invega-ER teaches a 50 percent reduction for mild. It does teach a 75 percent reduction for moderate to severe. You can see that in Appendix 16,233, which all, again, goes to why not just Claim 10, which is directly half, but also Claim 13, you know, Skoda Ericsson's non-automaton. And we understand that for different patients, maybe you're on the border between mild and moderate, you might want to do something even better for those so-called maintenance doses. Judge Adrena, you were asking about what constitutes, what are examples in this court's precedents that involve method claims? Almorel was a method claim. Both Claim 1 and Claim 6 in Almorel are methods for treating a dermatological condition. And each one of those, not, you know, it's not just titanium. Each one of those involves multiple different compositions. It had to be a certain weight of daspone, another with respect to diethylene glycol, another with respect to a polymeric viscosity barrier. That was a composition case? No, it's a method for treating a dermatological condition. You can see Claims 1, Claim 6 of the Almorel case, which is at 28F4, and I'm pointing to pages 268 to 269. But the key point that Almorel stands for and that Peterson stands for, you know, is that you can have various things that are being modified, each one of which falls within a range. And you are still in the presumption that's created by the range cases. And that's exactly what you have here. Each day that is on a known schedule, by which I mean the date, each day falls within a disclosed range. It falls, in fact, squarely between either 150 or 100. And as our expert explained, it's 10,322. The fact that you knew that 150, 150, 150 was safe, was thought to be safe and effective, 100, 100, 100 was thought to be safe and effective, that ergo anything in between them, mixing and matching on any day, would be safe and effective. It's literally taking the two for the learning purposes, taking the two, 150 and 100, adding them together, you get 250 and then splitting it out and saying, okay, I'm going to do 150 on the first day and 100 on the next. And prior art like Arashefsky and the Howard L. Labor at Appendix 16,651 teach that, you know, that is a way that you would do that. The other thing, too, her argument about trying to distinguish the 548 protocol saying, oh, it's a fixed amount every day. A skilled artisan knew at the time it was very, very common to vary the dosing. You might titrate up. You might titrate down. I point you to Appendix 12,379 with the testimony that it was not at all unusual to start patients with the highest approved and taper down.  I think we're running out of time. One final thought, one sentence. Yeah. So my final thought is that, you know, trying to distinguish away the 548 protocol, which doesn't stand alone. It stands with the 5404 patent, the WA184, on the basis that it was fixed dosing. It is not supported by the prior art, and it is certainly not supported by this Court's cases like Almerell and Peterson, among others. I'm happy to answer any additional questions the Court might have. Time up. Thank you. Thank you, Judge Breyer. The case is submitted.